IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
4:12-CV-211-FL

| | | |
|---|---|---|
| MELISA LOUISE FORBES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM AND** |
| | ) | **RECOMMENDATION** |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Melisa Louise Forbes ("plaintiff") challenges the final decision of

defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner")[1]

denying her application for a period of disability and disability insurance benefits ("DIB") and

supplemental security income ("SSI") on the grounds that she is not disabled.[2]  The case is

before the court on the respective parties' motions for judgment on the pleadings.  (D.E. 21, 23).

Each party filed a memorandum in support of its motion (D.E. 22, 24).  The motions were

referred to the undersigned Magistrate Judge for a memorandum and recommendation pursuant

to 28 U.S.C. § 636(b)(1)(B).  (Minute Entry dated 11 Mar. 2013).  For the reasons set forth

below, it will be recommended that the Commissioner's motion be allowed, plaintiff's motion be

denied, and the decision of the Commissioner be affirmed.

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), the court substitutes Carolyn W. Colvin for former defendant Michael J. Astrue.  *See* Fed. R. Civ. P 25(d).

[2] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

## I. BACKGROUND

### A. Case History

Plaintiff filed applications for DIB and SSI on 21 August 2009, alleging a disability onset date of 2 August 2004. Transcript of Proceedings ("Tr.") 164, 168. The applications were denied initially and upon reconsideration, and a request for hearing was timely filed. Tr., *e.g.*, 14. On 10 February 2011, a hearing was held before an Administrative Law Judge ("ALJ"). Tr. 30-52. In a written decision dated 23 March 2011, the ALJ found that plaintiff was not disabled and therefore not entitled to DIB or SSI. Tr. 14-24. Plaintiff timely requested review by the Appeals Council. Tr. 8-10. The Appeals Council admitted additional evidence (Tr. 1098-1123), but denied the request for review on 26 July 2012. Tr. 1-6. At that time, the decision of the ALJ became the final decision of the Commissioner. 20 C.F.R. §§ 404.981, 416.1481. Plaintiff commenced this proceeding for judicial review on 11 September 2012, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI). (*See* Compl. (D.E. 1)).

### B. Standards for Disability

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. §

1382c(a)(3)(B).  The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

(i) At the first step, we consider your work activity, if any.  If you are doing substantial gainful activity, we will find that you are not disabled. . . .

(ii) At the second step, we consider the medical severity of your impairment(s).  If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§ 404.1509 for DIB and § 416.909 for SSI], or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled. . . .

(iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in [20 C.F.R. pt. 404, subpt. P, app. 1] . . . and meets the duration requirement, we will find that you are disabled. . . .

(iv) At the fourth step, we consider our assessment of your residual functional capacity ["RFC"] and your past relevant work.  If you can still do your past relevant work, we will find that you are not disabled. . . .

(v) At the fifth and last step, we consider our assessment of your [RFC] and your age, education, and work experience to see if you can make an adjustment to other work.  If you can make an adjustment to other work, we will find that you are not disabled.  If you cannot make an adjustment to other work, we will find that you are disabled.  . . . .

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The burden of proof and production rests with the claimant during the first four steps of the analysis.  *Pass*, 65 F.3d at 1203.  The burden shifts to the Commissioner at the fifth step to show that alternative work is available for the claimant in the national economy.  *Id.*

In the case of multiple impairments, the Regulations require that the ALJ "consider the combined effect of all of [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity."  20 C.F.R. §§ 404.1523, 416.923.  If a medically severe combination of impairments is found, the combined impact of those impairments will be considered throughout the disability determination process.  *Id.*

C.     **Findings of the ALJ**

Plaintiff was 37 years old on the alleged onset date of disability and 43 years old on the date of the administrative hearing.  Tr. 22 ¶ 7; 33.  She has a high school education.  Tr. 22 ¶ 8, 33.  Her past work includes employment as a security guard, food server, convenience store clerk, office worker, production laborer, and retail sales clerk.  Tr. 22 ¶ 6; 33-37, 50.

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since her alleged onset of disability.  Tr. 16 ¶ 2.  At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations:  neck and low back pain, vertigo, depression, and poor memory.  Tr. 16 ¶ 3; *see* 20 C.F.R. §§ 404.1520(c), 416.920(c).  At step three, the ALJ found that plaintiff's impairments did not meet or medically equal any of the listings.  Tr. 17 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform light work with certain limitations.  Tr. 18 ¶ 5.  Light work involves lifting up to 20 pounds occasionally and lifting and carrying 10 pounds frequently.  *See* 20 C.F.R. §§ 404.1567(b), 416.967(b); *see also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "L-Light Work," http://www.oalj.dol.gov/libdot.htm (last visited 22 July 2013).[3]  The specific

---

[3] "Light work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT.  *See* 20 C.F.R. §§ 404.1567, 416.967.

limitations were that plaintiff could perform "simple, routine, repetitive tasks ["SRRT's"] in a low production work setting and is unable to work around hazards, including working at heights or around dangerous machinery." Tr. 18 ¶ 5. Based on this RFC, the ALJ found at step four that plaintiff was not capable of performing her past relevant work. Tr. 22 ¶ 6. At step five, the ALJ accepted the testimony of a vocational expert ("VE") and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of office helper, order caller, warehouse checker. Tr. 22-23 ¶ 10; 50-51. The ALJ accordingly concluded that plaintiff was not disabled. Tr. 23 ¶ 11.

## II.    DISCUSSION

### A.    Standard of Review

Under 42 U.S.C. § 405(g), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied. *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld. *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). Substantial evidence is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). It is more than a scintilla of evidence, but somewhat less than a preponderance. *Perales*, 402 U.S. at 401.

Where, as here, the Appeals Council considers additional evidence before denying the claimant's request for review of the ALJ's decision, "the court must 'review the record as a

whole, including the [additional] evidence, in order to determine whether substantial evidence supports the Secretary's findings.'" *Felts v. Astrue*, No. 1:11CV00054, 2012 WL 1836280, at *1 (W.D. Va. 19 May 2012) (quoting *Wilkins v. Sec'y Dep't of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991)).  Remand is required if the court concludes that the Commissioner's decision is not supported by substantial evidence based on the record as supplemented by the evidence submitted at the Appeals Council level.  *Id.* at *1-2 (holding that Commissioner's decision implicitly determining claimant not to have a severe mental impairment and failing to consider the effect of any such impairment on his ability to work was not supported by substantial evidence in light of additional evidence of claimant's depression admitted by Appeals Council, and remanding case to Commissioner for further proceedings).

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence.  *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir. 1992) (per curiam).  In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility.  *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979).  A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion.  *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).  "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator."  *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## B. Overview of Plaintiff's Contentions

Plaintiff contends that the ALJ erred by not finding that she met or medically equaled Listing 12.02, which addresses organic mental disorders, and by not properly assessing her RFC. Plaintiff's contentions are addressed in turn below.

## C. ALJ's Determination regarding Listing 12.02

The listings consist of impairments, organized by major body systems, that are deemed sufficiently severe to prevent a person from doing not only any substantial gainful activity, but any gainful activity at all. 20 C.F.R. §§ 404.1525(a), 416.925(a). Therefore, if a claimant's impairments meet or equal a listing, that fact alone establishes that the claimant is disabled. *Id.* §§ 404.1520(d), 416.920(d). An impairment meets a listing if it satisfies all the specified medical criteria. *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); Soc. Sec. R. 83-19, 1983 WL 31248 (1983). Even if an impairment does not meet the criteria, it can still be deemed to satisfy the listing if the impairment medically equals the criteria. 20 C.F.R. §§ 404.1525(c)(5) 416.925(c)(5). To establish such medical equivalence, a claimant must present medical findings equal in severity to all the criteria for that listing. *Sullivan,* 493 U.S. at 531; 20 C.F.R. §§ 404.1526(a), 416.926(a) (medical findings must be at least equal in severity and duration to the listed criteria). "A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment." *Sullivan*, 493 U.S. at 531.

Here, at step three, the ALJ found that plaintiff's impairments did not meet or medically equal Listing 12.02 for organic mental disorders, *i.e.*, "psychological or behavioral abnormalities associated with a dysfunction of the brain," or any other disorders. Tr. 17 ¶ 4. To satisfy Listing 12.02, a claimant first must satisfy the diagnostic definition for organic mental disorders.

Specifically, he must demonstrate through history and physical examination or laboratory tests

"the presence of a specific organic factor judged to be etiologically related to the abnormal

mental state and loss of previously acquired functional abilities."  Listing 12.02.  To meet the

required level of severity for organic mental disorders, a claimant must satisfy both the A and B

criteria or, alternatively, the C criteria.  *See generally id.*

> To satisfy the A criteria, a claimant must demonstrate:
>
> [A] loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
>
> 1. Disorientation to time and place; or
>
> 2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
>
> 3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
>
> 4. Change in personality; or
>
> 5. Disturbance in mood; or
>
> 6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
>
> 7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.

Listing 12.02A.  If these are met, a claimant must then establish, pursuant to the B criteria, that

the condition which is the subject of the A criteria results in at least two of the following:

> 1. Marked restriction of activities of daily living; or
>
> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration.

Listing 12.02B.  The ratings for the first three functional areas, in order of increasing level of

limitation, are:  none, mild, moderate, marked, and extreme.  *See* 20 C.F.R. §§ 404.1520a(c)(4),

416.920a(c)(4); Listing 12.00C.1-3. "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with your ability to function independently, appropriately, effectively, and on a sustained basis." Listing 12.00C. The last area—repeated episodes of decompensation, each of extended duration—"means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." *See* Listing 12.00C.4.

As an alternative to satisfying the A and B criteria, a claimant may satisfy the C criteria by showing:

> Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1.      Repeated episodes of decompensation, each of extended duration; or
> 2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Listing 12.02C.

In his decision, the ALJ found that plaintiff's severe impairments of depression and poor memory, considered singly and in combination, did not meet Listing 12.02 because they did not satisfy either the B or C criteria. Tr. 17 ¶ 4. Plaintiff contends that she meets both the A and B criteria for Listing 12.02. Plaintiff does not challenge the ALJ's C criteria determination.

Regarding the A criteria, plaintiff claims her impairments satisfy Listing 12.02A.7, which requires a measured loss of at least 15 points in intellectual ability[4] because the evidence demonstrates that she lost 34 points in her I.Q. between 2007 and 2009. However, the ALJ made no specific finding regarding the A criteria, addressing only the B and C criteria. *See* Tr. 17 ¶ 4. Presumably, he concluded that he did not need determine the issue of plaintiff's satisfaction of the A criteria because plaintiff's impairments did not satisfy the B criteria.

With respect to the B criteria, the ALJ determined that plaintiff had only moderate, not marked, limitations in activities of daily living, social functioning, and concentration, persistence, or pace, and that plaintiff had no qualifying episodes of decompensation. Listing 12.02B.1-3.[5] Tr. 17 ¶ 4. He explained these findings as follows:

> In activities of daily living, the claimant has moderate restriction as she reported having difficulty doing housework, including cleaning and cooking more than simple meals. In social functioning, the claimant has moderate difficulties as she reported no outside interests or activities with the exception of going to the grocery store. With regard to concentration, persistence or pace, the claimant has moderate difficulties due to memory problems. As for episodes of decompensation, the claimant has experienced no episodes of decompensation, which have been of extended duration.

Tr. 17 ¶ 4.

While plaintiff refers to these findings as "sparse," the ALJ's subsequent analysis of plaintiff's RFC further clarifies the reasons underlying his B criteria determination on Listing 12.02. The fact that the reasons underlying the ALJ's listing determination are not all set out at step three of the sequential analysis does not constitute legal error since the decision read as a

---

[4] Listing 12.02A.7 provides in its entirety as follows:

> Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.

Listing 12.02A.7.

[5] Plaintiff does not challenge the ALJ's determination regarding episodes of decompensation, and it is therefore not at issue in this appeal.

whole makes them clear. *See, e.g., Smith v. Astrue*, No. 11-1574, 2011 WL 6188731, at *1 (4th Cir. 14 Dec. 2011); *Lydia v. Astrue*, No. 2:11-1453-DCN-BHH, 2012 WL 3304107, at *5 (D.S.C. 25 Jul. 2012) (mag. judge's rep. & recommendation) ("This sort of deconstruction of the ALJ's decisions is not useful. The ALJ's decision must be read as a whole."), *adopted*, 2012 WL 3308108 (13 Aug. 2012); *Finley v. Astrue*, No. 5:08-CV-209-D(1), 2009 WL 2489264, at *5 (E.D.N.C. 8 Jul. 2009) (mag. judge's mem. & recommendation) ("[T]he ALJ's decision may appropriately be read 'as a whole.'" (quoting *Jones v. Barnhart*, 364 F.3d 501, 504-05 (3rd Cir. 2004))), *accepted,* 2009 WL 2489264, at *1 (13 Aug. 2009).

In his RFC analysis, the ALJ elaborates on his assessment of plaintiff's mental impairments, in part, as follows:

> Daily activities for the claimant were reported as picking up and straightening the living room and kitchen, folding small amounts of laundry, doing some microwave or quick meal cooking, wearing clothes that are easy to put [on] and . . . lying down several times a day. Testimony was also elicited from one of the claimant's friends who testified that she sometimes rides with the claimant when she goes to the store and that she sometimes passes the store by and has to turn around to go back to it. This friend also testified the claimant has trouble getting in and out of a chair and a car and that the claimant frequently looks tired.
>
> . . . .
>
> Her daily activities show she does not lead an entirely sedentary lifestyle as she apparently goes shopping, drives and does housework. [Plaintiff] has not been restricted by an examining physician or mental health professional from engaging in all forms of work activity. Although [plaintiff] testified she has a memory loss, the evidence also shows she was a full-time student in 2006, taking on-line courses (Exhibit 7F). This activity indicates [plaintiff] had sufficient attention, concentration and memory to complete work on-line. The testimony of the [plaintiff's] friend indicates [plaintiff] is able to drive, which involves acute awareness of surroundings coupled with the ability to make decisions without delay.

Tr. 21-22 ¶ 5. Substantial evidence supports these findings. *See, e.g.*, Tr. 44-46, 48. For example, Patient Activity Logs completed by plaintiff for an ambulatory electroencephalogram

("EEG") over a three-day period in February 2007 demonstrated that she cooked dinner, cleaned up after dinner, and went shopping on each of the three days. Tr. 553-54.

Further support for the ALJ's determination on the B criteria is to be found in the results of a 16 September 2009 neuropsychological evaluation by examining psychologist Deanna Jamison, M.A. Tr. 843-46. The ALJ described these results as follows:

> The [plaintiff] was noted to have logical thought processes, a pleasant mood and affect and no evidence of psychosis. Testing showed the [plaintiff] functioned within the borderline range of intellectual functioning. The examiner concluded the [plaintiff] did not appear to have any significant deficits in her memory functioning and was able to understand, retain and follow instructions, sustain attention to perform simple, repetitive tasks, relate to co-workers and supervisors and tolerate the stress and pressure of day-to-day work activities. The [plaintiff] was noted to have a GAF [*i.e.*, Global Assessment of Functioning[6]] of 65, indicating only mild symptoms, and did not have an Axis I diagnosis.

Tr. 19 ¶ 5. During this evaluation, plaintiff reported to Jamison that she "is able to cook and clean although she states it takes her a long time to do so. . . . She is able to bathe and dress herself. She drives and has a driver's license." Tr. 844. Based on the results of a memory skills test (*i.e.*, the Wechsler Memory Scale-Third Edition), Jamison concluded that plaintiff "appears to have adequate memory abilities for daily functioning." Tr. 845.

---

[6] The GAF scale measures a person's overall psychological, social, and occupational functioning. Am. Psych. Assn., Diagnostic and Statistical Manual of Mental Disorders 32 (4th ed. text rev. 2000) ("DSM–IV–TR"). Selected GAF scores have the following meanings:

> 80–71 If symptoms are present they are transient and expectable reactions to psychosocial stressors; no more than slight impairment in social, occupational, or school functioning.

> 70–61 Some mild symptoms OR some difficulty in social, occupational, or school functioning, but generally functioning pretty well, has some meaningful interpersonal relationships.

> 60–51 Moderate symptoms OR moderate difficulty in social, occupational, or school functioning in social, occupational, or school functioning.

> 50–41 Serious symptoms OR any serious impairment in social, occupational, or school functioning.

DSM–IV–TR 34.

Plaintiff's medical records from East Carolina Neurology, where plaintiff was treated between November 2006 and April 2010, also support the ALJ's B criteria findings. Tr. 527-69, 602-91, 935-1002. As the ALJ noted, these records show that plaintiff underwent extensive neurological testing that resulted in "no evidence of CNS [*i.e.*, central nervous system] or labyrinthine [*i.e.*, inner ear[7] abnormality"; "no evidence of a mass, abnormal enhancement or pathologic signal" from a cranial MRI; and normal findings from an EEG "indicating no evidence of seizure activity." Tr. 18 ¶ 5. The ALJ did note that testing indicated that plaintiff had only "some diminished memory," and that a change in medication was made "to determine if her memory difficulties were medication-induced." Tr. 19 ¶ 5.

These records further show that on 7 August 2007, during an office visit with J. Gregg Hardy, M.D., plaintiff stated that in the past she has had "excellent" memory and did not believe that her alleged memory loss was a "chronic problem," although that day she complained of impaired memory. Tr. 545. Dr. Hardy noted that a previous MRI did not show "anything structural to explain the 'memory loss.'" Tr. 545. Based on his examination of plaintiff during the visit, Dr. Hardy concluded that plaintiff's "[l]ong term and short-term memory are normal." Tr. 545. Additionally, plaintiff did not complain of memory issues during her two most recent visits documented in the record, on 1 March and 5 April 2010. Tr. 999-1002.

The ALJ also discussed plaintiff's medical records from ECU Physicians indicating that plaintiff was "referred for psychiatric examination and treatment with mental status examinations from May 2007 through November 2008, showing she exhibited a major depressive disorder." Tr. 19 ¶ 5 (referring to Tr. 692-721, 865-93). He noted that these examinations "showed the [plaintiff] was oriented, her thought process was goal-directed and there was no evidence of

---

[7] *See, e.g.*, Def. of "Labyrinth," Medline Plus, U.S. Nat'l Library of Medicine, http://www.merriam-webster.com/medlineplus/labyrinth (last visited 22 July 2013).

hallucinations or suicidal or homicidal ideation," but that her "judgment and insight were noted to be poor and she was continued on medication management." Tr. 19 ¶ 5. Plaintiff's two visits to this practice for psychiatric care each resulted in a diagnosis of depression to be treated with medication, with moderate impairment of functioning as indicated by a GAF score of 55. Tr. 700-02, 716-20; *see also* DSM-IV-TR 34.

Records of plaintiff's treatment by physicians at Carolina East Family Medicine from December 2006 to December 2008 reviewed by the ALJ also support his B criteria determinations. Tr. 19 ¶ 5 (referring to Tr. 570-83, 722-841). Plaintiff was treated for a variety of conditions and illnesses by this practice, including depression, *see, e.g.,* Tr. 743, 778, 781, 793, 802, and, on one occasion, memory loss, *see, e.g.,* Tr. 737. The records indicate that no treatment was required for the memory loss and that her depression was controlled by medication. *See, e.g.,* Tr. 737, 780, 783, 794, 804, 822; *see also*, *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it not disabling."). Further, as noted by the ALJ in his decision, during these office visits, mental status examinations were unremarkable and showed that plaintiff was oriented. Tr. 19 ¶ 5; *see, e.g.,* Tr. 744, 779-80, 782-83, 794, 803, 821-22.

Contesting the ALJ's B criteria determinations, plaintiff asserts that plaintiff's score on the memory test administered by Jamison in 2009 constitutes "objective" evidence that plaintiff suffers from marked restrictions in concentration, persistence, and pace, which precludes a finding of moderate limitations. (Pl.'s Mem. 14). In support of this argument, plaintiff cites 20 C.F.R. § 416.926a(e)(2)(i), which provides that a marked limitation "is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." 20 C.F.R. § 416.926a(e)(2)(i). Plaintiff

contends that "she was in the bottom 1st or 2nd percentile in most tests for new learning and memory" and therefore "her memory is, objectively, between two and three standard deviations from the mean." (Pl.'s Mem. 14).

This regulation, though, applies to children, not adults, as indicated not only but its text, but its title, "Functional equivalence for children." 20 C.F.R. § 416.926a. Even if it were deemed somehow applicable, plaintiff does not explain, and the court cannot determine, how the record of plaintiff's memory test scores (*see* Tr. 845) indicates that the scores fall in the statistical range suggested by plaintiff. Further, the neuropsychologist that interpreted the results of the test scores concluded that plaintiff "does not appear to have any significant deficits in her memory functioning." Tr. 845. This professional interpretation of the test scores hardly supports plaintiff's assertion that they definitively indicate that plaintiff's memory problems result in marked restrictions in concentration, persistence, and pace.

Plaintiff also cites the change in her I.Q. as a basis for finding marked restrictions in concentration, persistence, and pace. The court agrees that a 34-point drop in I.Q. is a significant change. However, because the first I.Q. score was 106, falling in the average range, *see* Tr. 563, the 34-point reduction still left her with a score of 72, which is in the borderline range of intelligence, *see* Tr. 844. Accordingly, the court concludes that the change in her I.Q., especially against the backdrop of the other medical evidence, does not dictate a finding of marked restrictions in concentration, persistence, and pace.

Plaintiff also challenges the ALJ's finding that her enrollment in online classes in 2006 demonstrates that she "had sufficient attention, concentration and memory." Tr. 21-22 ¶ 5. She asserts that she never completed the classes and that they predate the drop in I.Q. that allegedly began in 2007. (Pl.'s Mem. 14). But plaintiff does not cite to, nor does the court find, any

evidence in the record that plaintiff did not complete these classes. On the other hand, the record does contain several documents indicating that she did complete one year of college. *See* Tr., *e.g.*, 20, 233, 670, 921. As to plaintiff's enrollment in the classes before the alleged impairments began, that fact goes to the weight of the evidence. The court finds no legal error with respect to the ALJ's finding regarding plaintiff's online classes. Even if there were error, given the other evidence supporting the ALJ's B criteria determination, it would be harmless.

Plaintiff points to additional impairments that, when considered with the depression and memory loss, purportedly support a finding of marked severity, such as vertigo, "spacing out" due to suspected seizure activity, and migraines. It is clear that the ALJ considered these additional impairments because he discussed them all in his decision. *See generally* Tr. 18-21 ¶ 5. Further, there is substantial evidence to support the ALJ's conclusion that these additional impairments did not raise the severity of the B criteria to the marked level. As already discussed in detail above, extensive neuropsychological testing showed no evidence of seizure activity, and the records indicate that the episodes of loss of awareness were controlled by medication. *See* Tr. 538, 541, 635, 645, 709, 999-1002. The records also show that plaintiff's headaches were controlled with medication as well. *See* Tr. 538, 541. With respect to vertigo, the ALJ acknowledged the finding of an "abnormal vestibular autorotation, indicating episodic disequilibrium." Tr. 18 ¶ 5 (referring to Tr. 556). However, while plaintiff was referred for vestibular rehabilitation to treat the vertigo (Tr. 544), she cancelled the appointment "due to resolution of her symptoms " (Tr. 539).

Finally, plaintiff asserts that she has marked limitations in social functioning on the grounds that she "has no outside interests, never leaves the house except to go to the doctor or the grocery store, and has few friends" and that "[h]er depression symptoms continue to be

acute." (Pl.'s Mem. 15). However, these facts, on their face, do not support a finding of marked limitation because they indicate that plaintiff does, in fact, have some interaction in public and has at least some friends. Indeed, one of her friends testified on her behalf at the hearing before the ALJ, and stated that she sees the plaintiff "about every day." Tr. 47. More importantly, plaintiff directs the court to no evidence that would demonstrate she lacks the capacity "to interact independently, appropriately, effectively, and on a sustained basis with other individuals." Listing 1200C.2.

While ruling that plaintiff's depression and memory loss did not meet or medically equal Listing 12.02, the ALJ nevertheless acknowledged the effects of these impairments on plaintiff's functioning. He found them to be severe impairments at step two of the sequential analysis (Tr. 16 ¶ 3) and included limitations in her RFC determination responsive to these and the other mental impairments he found her to have. Specifically, he concluded as follows:

> [A]s a result of her complaints of vertigo, the claimant is precluded from working around hazards, including working at heights or around dangerous machinery. The claimant is also limited to [SRRT's] in a low production setting as a result of her borderline intellectual functioning, memory difficulties and depressive disorder.
> . . . .
>
> [Plaintiff's] problems with her memory limit her to [SRRT's] in a low production setting. Mental status examinations show [plaintiff] has logical thought processes with no evidence of psychosis and she would not be precluded from engaging in [SRRT's] as a result of her depressive disorder which has been treated with medication management.

Tr. 20-21 ¶ 5.

The evidence reviewed above constitutes substantial evidence that plaintiff did not have marked limitations in activities of daily living, social functioning, and concentration, persistence, or pace, as required to satisfy the B criteria of Listing 12.02. The court concludes that the ALJ's determination that plaintiff did not meet or medically equal the B criteria in listing 12.02, and

thereby that plaintiff did not meet or medically equal this listing, is supported by substantial evidence and based on proper legal standards.

### D. ALJ's RFC Determination

#### 1. Plaintiff's Mental Impairments

Plaintiff challenges the RFC determination, in part, on the grounds that it does not adequately account for plaintiff's mental impairments. While acknowledging that the ALJ addressed the effects of her memory impairment on her RFC, she asserts that the ALJ failed to adequately discuss the effects of her remaining mental health impairments: depression, vertigo, and seizure disorder. She argues that the combination of these mental health impairments dictate greater mental limitations in the RFC than those the ALJ imposed. Plaintiff's argument is without merit.

Remarkably, plaintiff asserts that the ALJ "assessed an incomplete RFC by simplifying and generalizing her mental health problems *to only include functional limitations based on her memory issues*." (Pl.'s Mem. 15) (emphasis added). To the contrary, and as set out verbatim above, the ALJ expressly imposed the limitation of SRRT's in a low production setting due to her depression, memory, and borderline intellectual functioning and the limitation of not working around hazards, including working at heights or around dangerous machinery, due to her vertigo. Tr. 20 ¶ 5. The ALJ did not include a limitation relating to a seizure disorder because he concluded that there was no evidence to support this impairment, stating that "EEG testing showed no evidence of a seizure disorder." Tr. 20 ¶ 5. Substantial evidence supports this finding. *See* Tr. 549, 551.

As reviewed in detail above, the ALJ discussed each of plaintiff's mental impairments as well as the evidence relating to them. Further, the decision makes apparent the ALJ's evaluation

of each impairment for purposes of plaintiff's RFC. Plaintiff's first challenge to the RFC determination is therefore meritless.

### 2. Plaintiff's Stamina to Work on a "Regular and Continuing Basis"

The RFC to perform work at the light (or any other) exertional level includes the ability to work on a regular and continuing basis, that is, eight hours a day for five days a week or an equivalent work schedule. *See* Soc. Sec. Ruling 96-8p, 1996 WL 374184, at *2 (2 Jul. 1996). Plaintiff contends that the RFC determination is erroneous because her musculoskeletal impairments, respiratory impairments, sleep impairments, and fatigue preclude her from working on a regular and continuing basis.

With respect to her musculoskeletal impairments, plaintiff contends that she is unable to stand and walk for the six hours out of an eight-hour workday as required for light work. But there is substantial evidence supporting the ALJ's determination that plaintiff's musculoskeletal impairments do not prevent her from performing a range of light work on a regular and continuing basis. The ALJ discussed the medical evidence of these impairments in detail in his decision (Tr. 18-20 ¶ 5), and then summarized his assessment of this evidence as follows:

> [O]n repeat examinations [plaintiff] exhibited no edema, clubbing or cyanosis, with a full range of motion present about her shoulders, arms, hips, knees and cervical spine, with mild tenderness to palpation about her mid to lower lumbar spine, normal motor strength testing with the exception of slightly decreased grip strength, no muscle atrophy, equal deep tendon reflexes and negative straight leg raising. [Plaintiff] was able to squat, do tandem walking without loss of balance and bend slightly in excess of 90 degrees at the waist. X-rays of [plaintiff's] spine showed no acute abnormality, with relatively well-maintained vertebral body heights and only mild disc space narrowing at L5-S1, with no soft tissue abnormality and normal sacroiliac joints. Repeat neurological evaluations have been within normal limits, including motor and sensory examination, coordination and deep tendon reflexes.

Tr. 20 ¶ 5. The examinations supporting this assessment include those by providers treating plaintiff. *See* Tr., *e.g.*, 280-367 (Exs. 1F, 2F) (29 Sept. 2003 to 28 April 2006; Wake Medical

Center); 368-405 (Exs. 3F, 4F) (28 Jan 2003 to 5 July 2006; Rock Quarry Road Family Medicine); 406-10 (Ex. 5F) (18 Aug. 2006; Eastern Radiologists, Inc.); 411-25 (Ex. 6F) (27 July 2006 to 18 Sept. 2006; Carolina East Family Medicine); and 426-458, 467-507 (Exs. 7F, 9F) (27 July 2006 to 17 Jan. 2007; Eastern Neurological & Spine Assoc.).

Plaintiff points to other medical evidence in the record, which she contends demonstrates her inability to work on a regular and continuing basis. For example, she asserts that "[o]n August 29, 2006, her spine specialist [Barbara E. Lazio, M.D.] noted difficulty going from sitting to standing position, and that '[a]ny form of activities, standing, sitting, walking exacerbate her symptoms.'" (Pl.'s Mem. 18 (citing Tr. 427)). However, on 5 October 2006, during her seventh and final session of physical therapy prescribed by the specialist, the physical therapist noted that plaintiff "denies any [pain] at present." Tr. 438; *see also* Tr. 439 (at the sixth session on 25 Sept. 2006, plaintiff stated that "[S]he feels 'great' today. No new complaints of pain today."). At bottom, plaintiff's argument amounts to no more than an invitation for this court to reweigh the evidence and come to different conclusions than the ALJ. Under the applicable standard of review, the court is not permitted to do so. *See Craig*, 76 F.3d at 589.

Plaintiff also cites to her own testimony that "she could stand in one spot for ten to twelve minutes, and can walk for two or three minutes." (Pl.'s Mem. 18 (citing Tr. 43)). However, after a thorough analysis of plaintiff's testimony and subjective complaints against the backdrop of the medical and other evidence of record, the ALJ concluded that plaintiff was not fully credible. Tr. 21-22 ¶ 5. Plaintiff has not challenged this determination.

Finally, while rejecting plaintiff's contention that her musculoskeletal impairments are disabling, the ALJ manifestly did take them into account in his RFC determination. As indicated, the ALJ limited her to light work. Tr. 20 ¶ 5. Notably, an RFC of light work entails

less exertional capacity (which involves lifting up to 20 pounds occasionally and lifting and carrying 10 pounds frequently) than plaintiff was found to have in three of four physical RFC assessments. Specifically, while a November 2006 physical RFC assessment found plaintiff to have exertional limitations consistent with light work (Tr. 460), the remaining three assessments in November 2007 (Tr. 55), January 2010 (Tr. 901), and April 2010 (Tr. 1004) found plaintiff capable of performing the exertional requirements for medium work (which involves lifting up to 50 pounds occasionally and lifting and carrying 25 pounds frequently). *See* 20 C.F.R. §§ 404.1567(c), 416.967(c). All four of the physical RFC assessments found plaintiff able to walk and/or stand about six hours in an eight-hour workday. Tr. 55, 460, 901, 1004.

The court concludes that the ALJ did not err in his evaluation of plaintiff's musculoskeletal impairments in determining her RFC. The court accordingly rejects this ground for plaintiff's challenge to the ALJ's RFC determination.

The other impairments that plaintiff contends deprive her of the capacity for regular and continuing work are her respiratory conditions, which include asthma, chronic obstructive pulmonary disease ("COPD"), and shortness of breath; sleep impairments, which include daytime somnolence and insomnia; and fatigue. The mere fact that plaintiff was or may have been diagnosed with these conditions is, of course, insufficient to support a finding of disability. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (holding that the diagnosis of a condition, alone, is insufficient to prove disability, because there must also be "a showing of related functional loss"); *see also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) ("The mere diagnosis . . . says nothing about the severity of the condition."). Interestingly, plaintiff provided no testimony about these conditions or how they affect her at the hearing before the ALJ.

Moreover, she has not cited to any medical evidence showing that these conditions or symptoms affect her functional abilities. For example, she relies on the record of a 10 May 2007 office visit to treating endocrinologist Andrei Talanotov, M.D., which lists her complaints of, among other things, fatigue, malaise, and shortness of breath with exertion. Tr. 707. However, there is no further indication in the record of this examination that these complaints resulted in any functional limitations. Tr. 707-15. Also, while plaintiff's treatment records do regularly reference asthma and COPD, such references are generally made in the context of plaintiff's medical history or the treatment provider's reassessment of the condition as one that is continuing, as opposed to a complaint for which plaintiff is seeking treatment. For example, plaintiff cites to an emergency room record dated 28 April 2006 indicating plaintiff was treated for hypertension. Tr. 284. Asthma was listed as part of plaintiff's past medical history, but not otherwise addressed during the visit. Tr. 284-85.

It is clear from the ALJ's decision that he considered these conditions and any evidence relating to them in determining plaintiff's RFC. For example, in discussing the December 2009 report of examining medical consultant E.C. Land, M.D., the ALJ found that plaintiff's "[c]ardiac and pulmonary examination was within normal limits" and noted Dr. Land's finding of "a history of mild asthma." Tr. 19 ¶ 5. The ALJ also found that with respect to plaintiff's complaints of sleepiness, "testing . . . showed no evidence of a need for a CPAP [*i.e.*, continuous positive airway pressure machine]." Tr. 19 ¶ 5. The court concludes that the ALJ did not err in his evaluation of plaintiff's alleged respiratory, sleep impairments, or fatigue in determining plaintiff's RFC.

### III.    CONCLUSION

After careful consideration of the ALJ's decision, the court concludes that it is supported by substantial evidence of record and based on proper legal standards. IT IS THEREFORE RECOMMENDED that the Commissioner's motion (D.E. 23) for judgment on the pleadings be ALLOWED, plaintiff's motion (D.E. 21) for judgment on the pleadings be DENIED, and the final decision of the Commissioner be AFFIRMED.

IT IS ORDERED that the Clerk send copies of this Memorandum and Recommendation to counsel for the respective parties, who have until 5 August 2013 to file written objections. Failure to file timely written objections bars an aggrieved party from receiving a de novo review by the District Judge on an issue covered in the Memorandum and Recommendation and, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the District Judge. Any response to objections shall be filed within 14 days after service of the objections on the responding party.

This, the 23rd day of July 2013.

_____
James E. Gates
United States Magistrate Judge